No. 24-1252

# In the United States Court of Appeals for the Seventh Circuit

RYAN STEINHOFF,

*Plaintiff-Appellant,*

v.

MATTHEW MALOVRH, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Wisconsin
No. 3:21-cv-00664-wmc
Hon. William M. Conley

## PLAINTIFF-APPELLANT'S REPLY BRIEF

Karl J. Worsham
PERKINS COIE LLP
2525 E. Camelback Rd., Ste. 500
Phoenix, Arizona 85016
Phone: (602) 351-8000
kworsham@perkinscoie.com

Sopen B. Shah
 *Counsel of Record*
PERKINS COIE LLP
33 E. Main St., Ste. 201
Madison, Wisconsin 53703
Phone: (608) 663-7460
sshah@perkinscoie.com

*Attorneys for Plaintiff-Appellant Ryan Steinhoff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 3

I.  The record—especially the video—establishes that Kowalczyk used significant force on a compliant, nonresisting, and nonfleeing person. .................................... 3

II.  Qualified immunity does not protect Kowalczyk because the prohibition on using significant force against nonresisting or passively resisting persons was clearly established before 2018. ................................ 15

III.  Steinhoff's claim against Malovrh should proceed to trial because Malovrh's takedown used at least as much force as Kowalczyk's. ......................................... 21

    A.  Steinhoff has always claimed that Malovrh's takedown violated his Fourth Amendment rights. ................................................................ 23

    B.  Malovrh does not meaningfully dispute that his rifle struck Steinhoff's ear during his takedown. ......................................................... 25

    C.  This Court cannot separate the rifle strike, whether intentional or not, from its analysis of the force used to take Steinhoff to the ground. ........................................................... 25

    D.  Steinhoff presented evidence that Malovrh's rifle strike was intentional. ..................................... 29

CONCLUSION .................................................................................. 33

CERTIFICATE OF COMPLIANCE ................................................... 35

CERTIFICATE OF SERVICE ........................................................... 36

# TABLE OF AUTHORITIES

CASES                                                    Page(s)

*Abbott v. Sangamon County,*
    705 F.3d 706 (7th Cir. 2013)..............................4, 8, 9, 12, 16

*Alicea v. Thomas,*
    815 F.3d 283 (7th Cir. 2016).........................4, 9, 11, 16, 17, 18, 20, 21

*Bailey v. United States,*
    568 U.S. 186 (2013).............................................................5

*Baird v. Renbarger,*
    576 F.3d 340 (7th Cir. 2009)....................................9, 10, 19

*Barnes v. Felix,*
    605 U.S. 73 (2025)...........................................................9, 26

*Brower v. County of Inyo,*
    489 U.S. 593 (1989)........................................................27, 28

*Burton v. City of Zion,*
    901 F.3d 772 (7th Cir. 2018).............................................11

*Clash v. Beatty,*
    77 F.3d 1045 (7th Cir. 1996).........................................5, 19

*Johnson v. Scott,*
    576 F.3d 658 (7th Cir. 2009).........................................7, 8

*Kemp v. Fulton County,*
    27 F.4th 491 (7th Cir. 2022) .......................................28, 29

*Kingsley v. Hendrickson,*
    576 U.S. 389 (2015)......................................................28, 29

*Kisela v. Hughes,*
    584 U.S. 100 (2018).........................................................17

*Miller v. Gonzalez,*
    761 F.3d 822 (7th Cir. 2014)......4, 11, 15, 16, 20, 21, 28, 29, 31, 32, 33

*Morfin v. City of East Chicago,*
349 F.3d 989 (7th Cir. 2003) .............................................................. 18

*Payne v. Pauley,*
337 F.3d 767 (7th Cir. 2003) .............................................................. 19

*Phillips v. Cmty. Ins. Corp.,*
678 F.3d 513 (7th Cir. 2012) .............................................................. 18

*Scott v. Harris,*
550 U.S. 372 (2007) .............................................................................. 14

*Smith v. Finkley,*
10 F.4th 725 (7th Cir. 2021) ...................................................... 15, 19

*Snowden v. Henning,*
72 F.4th 237 (7th Cir. 2023) .............................................................. 21

*Springer v. Durflinger,*
518 F.3d 479 (7th Cir. 2008) .............................................................. 32

*Thompson v. Cope,*
900 F.3d 414 (7th Cir. 2018) .............................................................. 18

*Torres v. Madrid,*
592 U.S. 306 (2021) ...................................................................... 26, 27

*Turner v. City of Champaign,*
979 F.3d 563 (7th Cir. 2020) ...................................................... 26, 27

# INTRODUCTION

Several police officers detained Ryan Steinhoff pursuant to a search warrant for a property with a trailer on it. Bodycam footage shows that the officers trained their guns on Steinhoff, who slowly and carefully complied with their competing commands—he exited the trailer, voluntarily raised his hands, turned his back to the officers, stopped, and did not flee. Video 7:39-42; Opening Br. 7-8, 22-23. Nevertheless, two officers—Kowalczyk and Malovrh—tackled him to the ground. Evidence showed that the barrel of Malovrh's rifle split Steinhoff's ear open during this takedown, creating an injury that required stitches.

Steinhoff brought a Fourth Amendment excessive-force claim against Kowalczyk and Malovrh because it is clearly established that officers cannot push or shove—let alone tackle and strike with a gun—non-resisting individuals detained pursuant to a search warrant. The district court incorrectly denied Steinhoff summary judgment against Kowalczyk and incorrectly granted Kowalczyk and Malovrh summary judgment against Steinhoff.

The officers' defense of the district court's erroneous opinion is based entirely on a misunderstanding of both the facts and the legal standards for summary judgment and qualified immunity.

First, they call a "[d]isputed" fact, R.53 ¶ 4, at the very core of this case "*undisputed*," Response Br. 25-26 (citing R.53 ¶ 4). The officers claim that it is undisputed that "[a]lthough Steinhoff was ordered to turn around, [he] began walking to the south along the camper and away from officers," but Steinhoff disagreed and pointed out that the video showed that he took steps *to turn around*, as ordered. R.53 ¶ 4.

Second, the officers repeatedly (and incorrectly) assume that their version of the facts controls. But the court must take the facts in the light most favorable *to Steinhoff* on the officers' motions for summary judgment and in the qualified immunity analysis. The district court found that a reasonable jury could "conclude that [Steinhoff] was cooperating with defendants' efforts to detain him and never attempted to flee." App.12. Thus, the court had to treat Steinhoff as a nonresistant suspect.

Third, contrary to Respondents' claim, caselaw is clear that the Constitution prohibits law enforcement officers from using significant

force on a nonresistant individual even if he might be a suspect in a crime generally "associated with violence."

Fourth, a court cannot exclude Malovrh's rifle strike to Steinhoff's head—whether intentional *or* accidental—from its analysis of whether the force Malovrh used to take Steinhoff down was excessive.

At a minimum, this Court must reverse the grant of summary judgment to Kowalczyk and Malovrh.

## ARGUMENT

### I. The record—especially the video—establishes that Kowalczyk used significant force on a compliant, nonresisting, and nonfleeing person.

The dispositive facts are captured in less than a minute of bodycam footage and the accompanying testimony. Malovrh ordered Steinhoff to show his hands and come out of the trailer. Response Br. 26. Steinhoff showed Malovrh his hands, App.45 at 36:24-25 (Malovrh testifying that Steinhoff "showed me his hands"), and came out of the trailer. The officers ordered Steinhoff to "turn around." Response Br. 26. Steinhoff turned left, turning his back to the officers that were to his right and in front of him when he exited the trailer. Video 7:39-41. As he completed the turn, he voluntarily raised his hands. *Id.* He brought his right foot back in line

with his left and visibly stopped. *Id.* While Steinhoff was still receiving rapid-fire commands to turn around, Kowalczyk began a takedown. App.5; Video 7:40-42. Notably, no officer yelled "stop," "freeze," or anything similar. (Indeed, such commands would have contradicted those telling him to move—e.g., turn around, put his hands behind his back.) In sum, Steinhoff gave every indication of submission and gave no sign of resistance or flight. Video 7:39-42; Opening Br. 21-25.

Steinhoff was not resisting or fleeing, and it has been "well-established" since at least 1995 that "police officers" cannot "use significant force on nonresisting or [even] passively resisting suspects." *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013) (collecting cases); *see also Alicea v. Thomas*, 815 F.3d 283, 292 (7th Cir. 2016); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014).

Respondents do not meaningfully dispute that they used significant force on Steinhoff. They say that they did not "tackle" or "shove" Steinhoff and instead used a "decentralization" technique to "take[ ] [him] to the ground" and "effect an arrest." Response Br. 28. Even assuming that there is some difference between a tackle and a "decentralization" that "take[s] [someone] to the ground," Response Br. 29, the latter is still

"significant force." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (significant force includes shoving, pushing, or "otherwise assault[ing]").

Respondents have no argument or authority to the contrary. And as discussed in the opening brief, Respondents had no right to "effect an arrest" of Steinhoff. "Detentions incident to the execution of a search warrant" must be "limited intrusion[s] on personal liberty." *Bailey v. United States*, 568 U.S. 186, 201-02 (2013).[1] Kowalczyk's and Malovrh's unprovoked "decentralization" of Steinhoff was anything but limited. To the extent that officers were concerned that Steinhoff might attempt to walk away, they could have yelled "stop" or "freeze" before assaulting him.

Next, Kowalczyk and Malovrh imply that Steinhoff was resisting because "[i]t was undisputed that Steinhoff did not show officers his hands, turned away from officers toward a large open field, and began

---

[1] Because such detentions are "exception[s]" "outside of the traditional rules of the Fourth Amendment," they "must be circumscribed." *Bailey*, 568 U.S. at 200. The authority to detain comes from "the law enforcement interests in conducting a safe and efficient search," *id.*: specifically, "officer safety, facilitating the completion of the search, and preventing flight," *id.* at 194. Importantly, "[t]he concern over flight" is not to "facilitate a later arrest should incriminating evidence be discovered," *id.* at 199; rather, detention is intended to "preven[t] the search from being impeded by occupants leaving with the evidence being sought or the means to find it," *id.* at 198.

walking in that direction before Detective Kowalczyk decentralized him."

Response Br. 29; *see also* Response Br. 26 (citing R.53 ¶ 4).[2] They are

wrong.

Taking each assertion in turn: first, Malovrh testified that Steinhoff

"showed me his hands." App.45 at 36:24-25. Second, Steinhoff turned

away from officers "toward a large open field" because that was the only

way for him to have his back to the officers telling him to turn around.

Response Br. 26-27. Third, Steinhoff "[d]isputes" that he "began walking"

toward the large open field. Respondents' own record cite for that propo-

sition, R.53 ¶ 4, shows that Steinhoff "[d]isputed" Respondents' version

and pointed the court to what the "video shows," R.53 ¶ 4.[3] Steinhoff

agreed that he "took a few steps to the south," but he did so not *despite*

---

[2] The first time that the officers claim that Steinhoff "actively resisted" occurs in their discussion of the events *following* their tackle of Steinhoff. Response Br. 8. But this appeal is about the events before and during the tackle. *See* Opening Br. 10 n.3.

[3] Tellingly, Respondents rely on "the responses to the parties' respective proposed findings of fact, rather than the evidence in the record, to con-firm that these facts were undisputed." Response Br. 25 n.2. Their "con-firm[ation]" is wrong, *see* R.53 ¶ 4. In addition, they fail to engage mean-ingfully with the bodycam footage, choosing instead to disregard it as "unclear" and "fairly open to varying interpretations." Response Br. 27-28 (citation modified). But even if the footage is unclear, it does not con-clusively support the officers' version of events either.

the officers' order to turn around but *because* of it. R.53 ¶ 4; Opening Br. 8 (explaining that Steinhoff had to turn left (south) in order to "show[ ] his back to the officers giving commands on his right"). The video shows that Steinhoff "stops turning" and "brings his right foot level with his left foot and stands at a 45-degree angle to the camper" right before Kowalczyk tackles him. Opening Br. 8 (citing Video 7:41). Thus, it is far from "undisputed" that Steinhoff was walking away, let alone fleeing, when Kowalczyk took him to the ground.

Respondents next argue that officers can use significant force against "fully compliant" suspects who are "not subdued" and that Steinhoff was "not yet subdued" when "Kowalczyk took Steinhoff down." Response Br. 16-17 (citing *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009)). Respondents offer no definition of "subdued" that Steinhoff would not meet. To the extent that Respondents are arguing that "subdued" means handcuffed, like the district court suggested, Response Br. 28, or "lying motionless and spread-eagled on the ground," Response Br. 33, or on the ground convulsing and not moving post-tase, Response Br. 21, Respondents' position cannot be the law. Police cannot use significant force against any compliant suspect that happens to be standing or un-cuffed.

That rule would vitiate nearly three decades of this Court's jurisprudence. *Abbott*, 705 F.3d at 732.

   *Johnson* does not help Respondents. There, the police were justified in using force after Johnson, suspected in a shooting, "had used every method at his disposal to flee from the police," including driving through a stop sign and speeding, "[u]ntil he encountered a fence that was too high for him to jump over." *Johnson*, 576 F.3d at 660. Also, a reasonable officer could have thought that Johnson was armed. *Id.* Here, Steinhoff did not use any method to flee from the police, and Kowalczyk had no basis to think that Steinhoff was armed. Opening Br. 21-22. Indeed, Kowalczyk "placed [his] ballistic shield on the ground and secured [his] handgun in [his] holster" before tackling Steinhoff. *See* R.40 ¶ 41. It seems unlikely that an officer would set down a shield if confronted with an armed suspect.

   Respondents then attempt to justify their use of significant force based on (1) pre-raid briefing that someone might possibly attempt to flee, (2) a general association between drug crimes and violence, (3) Steinhoff's prior conduct, and (4) a general deference to law enforcement. These grounds are insufficient.

To the extent that at the pre-raid briefing the officers "thought it was *possible or* likely that [another suspect] and Steinhoff *might* attempt to flee," R.52 ¶ 18 (emphasis added) (cited at Response Br. 26), that belief was no longer objectively reasonable at the moment of significant force. And it is "the situation at th[at] precise time" that "matters most." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). "[A]s the threat changes, so too should the degree of force." *Abbott*, 705 F.3d at 729 (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010)). Even suspects who were fleeing should be able to "surrender" "as a means to de-escalate a confrontation with law enforcement." *Alicea*, 815 F.3d at 289. At the moment of significant force, nothing justified a violent takedown. There was no weapon, no aggressive movement, no interference with the search, and no flight.

Next, generalized risk associated with a category of crime cannot convert an individual's compliance into an immediate threat justifying significant force. Respondents argue that they can tackle a nonresisting person if he is "suspected" of "methamphetamine trafficking" because "drug crimes are associated with violence." Response Br. 13 (citing *Baird*

*v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009)). Not so; police cannot tackle—or "decentralize"—every suspect of a drug crime.

*Baird* supports Steinhoff's position. *Baird* held that drug crimes' association with violence "entitle[s] [the police] to point their guns" at a suspect, 576 F.3d at 344-46, but not more. And *Baird* itself reaffirmed that "police officers do not have the right to shove, push, or otherwise assault" nonresistant suspects of even violence-associated crimes. *Id.* at 345 (quoting *Clash*, 77 F.3d at 1048). "In other words, the fact that Steinhoff was suspected of a drug crime allowed the officers here to point their guns at him," but "did not authorize them to push, shove, or tackle him unless he actively resisted detention." Opening Br. 27 (citing *Baird*, 576 F.3d at 345).

Steinhoff does not "attempt to discount the severity of the crime at issue," *contra* Response Br. 13, or dispute its general relevance. He acknowledges that the "underlying crime may have been relevant before the officers began interacting with [him], but once they had their guns trained on him, and it became clear that Steinhoff was compliant and nonresistant, any justification to use force disappeared." Opening Br. 26-27 (citing *Miller*, 761 F.3d at 829; *Abbott*, 705 F.3d at 729).

Respondents also try to justify their takedown of a nonresisting suspect by pointing to "Steinhoff's previous convictions," some for purportedly "violent" crimes. Response Br. 13-14. They incorrectly claim that those prior convictions plus the suspected drug crime here allowed them to act as if Steinhoff had "weapons." *Id.* Respondents cite *Burton v. City of Zion*, 901 F.3d 772, 781 (7th Cir. 2018), for the proposition that officers may take "prior bad acts" into account when "deciding on a reasonable amount of force." Response Br. 13.[4] Not so. And *Miller* is clear that the "prohibition against significant force" applies with equal force "notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or *potentially carrying a weapon*." 761 F.3d at 829 (emphasis added). Said differently, prior bad acts cannot justify assaulting a nonresisting or passively resisting suspect. *See Alicea*, 815 F.3d at 289 ("The sole fact a suspect has resisted arrest before cannot justify disregarding his surrender in deciding whether and how to use force."). And as Respondents acknowledge, Steinhoff "did not have any

---

[4] *Burton* actually held that a *police officer* had to consider "*his own* prior bad acts," specifically, his previous "handcuff[ing] and tas[ing]" of the plaintiff, which was "found to be an excessive use of force," "when considering the amount of force to use" when apprehending her again. *Id.* at 781-82 (emphasis added).

weapons in his hands and the officers had *no indication he was armed*." Response Br. 14; Opening Br. 21-22. So even if Steinhoff's prior conduct and/or the suspected crime suggested that force might be needed, once the officers interacted with Steinhoff and saw that he was compliant and nonresistant, any justification to use force disappeared. Opening Br. 27. After all, "as the threat changes, so too should the degree of force." *Abbott*, 705 F.3d at 729 (quoting *Cyrus*, 624 F.3d at 863).

Notably, Kowalczyk has never argued that his takedown of Steinhoff was justified based on the risk of harm to the officers. Kowalczyk explained in his report, declaration, and deposition testimony that the only basis for the takedown was his concern that Steinhoff might attempt to flee. R.36-2 at 1; R.40 ¶ 40; R.30 at 15. On appeal, his counsel now argues that Kowalczyk thought that Steinhoff "would attempt to … reach for a weapon," Response Br. 8, 15 (citing R.40 ¶ 40), despite the several guns trained on Steinhoff, R.31 at 31:24-32:2; *see also* App.37 at 17:6-10; App.42 at 15:4-7. But that paragraph of Kowalczyk's declaration says nothing about a weapon. *See* R.40 ¶ 40 ("suspected Steinhoff was about to flee"). Indeed, if Kowalczyk actually thought that Steinhoff would attempt to reach for a weapon, it would have been odd for him to "place[ ]

[his] ballistic shield on the ground and secure[ ] [his] handgun in [his] holster" as he did before tackling Steinhoff. *See* R.40 ¶ 41.

Counsel also points to Kowalczyk's application for a no-knock warrant to suggest that Steinhoff was dangerous, Response Br. 14, but a neutral magistrate denied that request.

With no other fallback, Respondents ask the court to consider these purportedly "dynamic circumstances" and defer to their "split-second judgment" in a "tense, uncertain, and rapidly evolving" situation. Response Br. 15-16, 44 (citation modified). But the record, especially in light of the video, reveals a situation that was anything but "dynamic" and "rapidly evolving." When Steinhoff stepped out of the trailer, Kowalczyk and Malovrh stood shoulder-to-shoulder with about a half-dozen armed officers. App.3. With multiple guns trained on him, Steinhoff moved "slowly." Response Br. 7. "[H]e did not have any weapons in his hands and the officers had no indication he was armed." Response Br. 14. Steinhoff turned on command, raised his hands above his head—making (1) them visible to all officers and (2) running difficult—and stopped moving. Video 7:39-42. The only "rapid[ ]" part of the situation was Kowalczyk's sudden surge toward Steinhoff.

If the officers' conduct is constitutional, then any "officer with a warrant to search for drug activity at a residence you are in (but without a warrant to arrest you) could tackle you to the ground so long as the pre-search briefing said that" it is possible that "one of the suspects might attempt to flee and you had some open space in front of you." Opening Br. 24-25. Respondents dismiss this risk as "wholly unsupported and divorced from the specific facts of this case," but they do not explain why. Response Br. 29. Short of reading Kowalczyk's mind, handcuffing himself, or dropping spread-eagle to the ground, it is difficult to imagine what, if anything, Steinhoff could have done to avoid being tackled that morning.

In sum, the district court should have denied summary judgment to Kowalczyk and should have granted summary judgment to Steinhoff. Under no circumstances is Respondents' version of events—that Steinhoff disregarded police orders and began "walking to the south along the camper and away from officers," Response Br. 26, "undisputed," especially when "viewing the facts and drawing reasonable inferences in the light most favorable to [Steinhoff]," *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation modified). Steinhoff has evidence, including video, that

he complied with all police orders and did not flee. Either Steinhoff's non-resistance is undisputed because the video establishes that he was compliant and submissive or—as even the district court acknowledged, App.12—a reasonable jury could conclude that the video and other evidence establish that fact, Video 7:39-42; Opening Br. 21-25. Under either view of the record, Steinhoff wins this appeal. Opening Br. 42.[5]

## II. Qualified immunity does not protect Kowalczyk because the prohibition on using significant force against nonresisting or passively resisting persons was clearly established before 2018.

Here, "the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right" that was "clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (citation modified). The facts show that Steinhoff was not dangerous, was not resisting, and was not fleeing at the time that Kowalczyk (and Malovrh) tackled him to the ground.

---

[5] Steinhoff deserves summary judgment even under the officers' view of the facts, which is unsupported by the record. Even if Steinhoff had not obeyed an order about his hands and had been "walking to the south along the camper," Response Br. 26, this is mere passive resistance, especially when law enforcement had not told Steinhoff to "stop" or "freeze." *See Miller*, 761 F.3d at 829.

The constitutional right of a nonresisting suspect (or individual detained pursuant to a search warrant) not to be tackled was clearly established by 2018. Since at least 1995, this Court has recognized that "police officers" cannot "use significant force on nonresisting or [even] passively resisting suspects" or individuals. *Abbott*, 705 F.3d at 732 (collecting cases going back to 1995); *Alicea*, 815 F.3d at 292 ("It was also clearly established that using a significant level of force on a nonresisting or a passively resisting individual constitutes excessive force."); *Miller*, 761 F.3d at 829 ("[T]he law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest." (quoting *Abbott*)). Since at least 2014, that "prohibition against significant force applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." Opening Br. 19 (citation modified). And the "sole fact a suspect has resisted arrest before cannot justify disregarding his surrender in deciding whether and how to use force" today. Opening Br. 19-20 (quoting *Alicea*, 815 F.3d at 289). Significant force includes shoving, pushing, or otherwise assaulting nonresisting suspects or individuals detained

during an investigatory stop. Opening Br. 20 (collecting cases dating back to 1996).

Respondents argue that "qualified immunity was appropriate because" Steinhoff did not identify a Seventh Circuit or U.S. Supreme Court case in which "taking to the ground someone suspected of drug trafficking during the execution of a search warrant" violated the Fourth Amendment. Response Br. 18-19. But that requires too much. The U.S. Supreme Court's "caselaw does not require a case directly on point for a right to be clearly established" under the Fourth Amendment. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation modified). "Precedent" need only "involv[e] *similar* facts" to "help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Id.* at 105 (emphasis added) (citation modified). Indeed, the goal of that precedent is to "defin[e]" a "right's contours," and no single case can define the contours of a constitutional right. *Id.*

This Court agreed that "a case holding that the exact action in question is unlawful is not necessary." *Alicea*, 815 F.3d at 291. An opinion's "general reasoning" is sufficient "for purposes of putting the defendant

on notice that his conduct is clearly unconstitutional." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012) (citation modified). "Even where there are notable factual distinctions, prior cases may give an officer reasonable warning that his conduct is unlawful." *Alicea*, 815 F.3d at 291.[6]

Respondents next argue that Steinhoff needs a "closely analogous case" and does not have one because Steinhoff's cases "involved much more egregious uses of force on far less dangerous individuals who were fully or substantially subdued and compliant with commands and where there was no risk of flight and no reasonable threat of harm." Response Br. 17-18, 25. Not so.

First, many of the cases Steinhoff relies on involved equally or less egregious uses of force. *Contra* Response Br. 25. For example, *Morfin v. City of East Chicago*, 349 F.3d 989, 1004-05 (7th Cir. 2003), involved two officers grabbing a nonresisting suspect and taking him to the floor, as

---

[6] Respondents argue in one place in their brief that Steinhoff *also* needs to show "that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." Response Br. 17-18 (citing *Thompson v. Cope*, 900 F.3d 414, 420 (7th Cir. 2018)). Respondents are wrong; *Thompson* says no such thing.

happened here. An officer in *Clash* shoved an individual detained during an investigatory stop. The officer in *Payne v. Pauley* yanked the arms of and used tight handcuffs on a nonresistant individual who was alleged to have obstructed the officer's duties. 337 F.3d 767, 779-80 (7th Cir. 2003). *Baird* involved an officer pointing a gun at people detained pursuant to a search warrant. Response Br. 23-24. *Baird* indicated that although officers might be able to point their guns at people suspected of a drug crime, "police officers do not have the right to shove, push, or otherwise assault" nonresistant suspects. 576 F.3d at 345. In sum, many cases establish a right to be free from even less force than the officers used on Steinhoff.

Second, Respondents' characterization of the cases incorrectly accepts *their own* version of the facts when the Court must do the opposite. *See Smith*, 10 F.4th at 737. Steinhoff had undisputed evidence that he was not dangerous and that there was no reasonable threat of harm when he was taken down. Steinhoff also had evidence that he was fully compliant and that there was no risk of flight. Taking the facts presented in the light most favorable to Steinhoff, the Respondents tackled a nonresisting, compliant individual detained pursuant to a search warrant.

Third, even if this Court accepted Respondents' characterization of the facts, the individuals in Steinhoff's cases were not "far less dangerous" or presenting "no risk of flight." *Miller* applied the significant-force prohibition to a stabbing suspect that had previously fled the police and that did not obey the police's "order to move his hands behind his back". 761 F.3d at 824-25, 829. There, the Court explained that the "prohibition against significant force" applies despite "a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Id.* at 829.

*Alicea* applied the significant-force prohibition to "a felony burglary suspect" allegedly "in active flight." 815 F.3d at 288. There, the police found the suspect—"under [the suspect's] version of the facts"—"standing still, [with] arms raised" in an empty above-ground pool. *Id.* at 289. This Court concluded that both the suspect's "prior flight" and the fact that the "suspect ha[d] resisted arrest before" could not justify the officers' use of force. If the suspect claimed that he was not fleeing at the moment of force, "[t]he sole fact a suspect has resisted arrest before cannot justify disregarding his surrender in deciding whether and how to use force." *Id.*

As serious as the suspected crime was here, it was not burglary (*Alicea*) or stabbing (*Miller*). And unlike the suspects in those cases, Steinhoff had not fled the officers' efforts to detain him. Just as the officers in *Alicea* and *Miller* could not let the suspects' prior flight or resistance override their present compliance, Kowalczyk and Malovrh were on notice that the same principle applied to Steinhoff. Indeed, "[o]fficers have clear guidance on the level of force that is reasonable when arresting a suspect who does not resist." *Snowden v. Henning*, 72 F.4th 237, 246 (7th Cir. 2023), *cert. denied*, 145 S. Ct. 137 (2024). The contours of a nonresisting suspect's Fourth Amendment's right against the use of excessive force have been clearly defined, and this case is well within them.

## III. Steinhoff's claim against Malovrh should proceed to trial because Malovrh's takedown used at least as much force as Kowalczyk's.

Steinhoff alleged that Malovrh's decision to tackle Steinhoff to the ground, including by "battering [him] with an assault rifle," violated the Fourth Amendment. App.30-34 ¶¶ 33 (alleging that Malovrh "jumped on [Steinhoff], throwing him to the ground"), 37 (alleging that Malovrh "pounced on [Steinhoff], violently taking him to the ground"), 57 (alleging

that Malovrh "batter[ed] Plaintiff with an assault rifle" and "violently thr[e]w[] him to the ground").

Malovrh moved for summary judgment, arguing that his "decision to decentralize Steinhoff" as a whole was reasonable. R.38 at 6-9. He then argued that "to the extent" that the rifle strike was "severable from [Malovrh's] decision to decentralize Steinhoff," R.39 at 11, it could not on its own be the basis for an excessive force claim. R.38 at 9-11.

The district court held that a jury could not reasonably find that "Malovrh['s] cho[ice] to assist in subduing plaintiff with a rifle in a sling on his left shoulder after another officer chose to effect a takedown … constituted excessive use of force in violation of the Fourth Amendment." App.20. The court also held that Steinhoff failed to provide evidence that Malovrh struck him in the head with the rifle "intent[ionally] or reck-less[ly]." App.19-20. Thus, it granted summary judgment to Malovrh on these aspects of Malovrh's use of force.

The district court erred in granting summary judgment to Malovrh. When viewing the evidence in the light most favorable to Steinhoff, Malovrh's takedown was at least as unconstitutional as Kowalczyk's. Opening Br. 32-34. Not only did Malovrh tackle Steinhoff when there was

*even less of a risk of flight* given that Kowalczyk had already begun "de-centralization," but also Steinhoff presented evidence that Malovrh's rifle hit him in the head during Malovrh's takedown, creating an injury that required stitches. Under the proper standard, the district court was required to credit this evidence and thus should have denied Malovrh's motion for summary judgment.

### A. Steinhoff has always claimed that Malovrh's takedown violated his Fourth Amendment rights.

First, Steinhoff "must address" Malovrh's accusation that Steinhoff is attempting to "create a new claim against Investigator Malovrh" for Malovrh's taking of Steinhoff to the ground. Response Br. 45. Malovrh concedes that Steinhoff claimed that Malovrh violated his Fourth Amendment rights when Malovrh allegedly "jumped on him, throwing him to the ground," "pounced on him," and "violently threw him to the ground." Response Br. 45. Thus, Steinhoff has always claimed that Malovrh—just like Kowalczyk—violated his Fourth Amendment rights when Malovrh tackled Steinhoff. (Indeed, it would have been odd for Steinhoff to claim that Kowalczyk violated his rights when Kowalczyk threw him to the ground but not to claim that Malovrh violated his rights when Malovrh "violently" did the same, Response Br. 45.) And the only

conduct Steinhoff decided not to challenge on appeal is "Malovrh's conduct once Steinhoff was on the ground," not the conduct that put Steinhoff there. Opening Br. 10 n.3; *contra* Response Br. 45-48. So Malovrh's argument that Steinhoff created on appeal a new claim against Malovrh "is nonsensical at best … and should not be tolerated by this Court," Response Br. 47.

Next, Malovrh argues that he can use a "takedown to end mild resistance" and that when he joined the takedown, Steinhoff was "not yet subdued." Response Br. 48. Both arguments fail. Steinhoff did not put up even "mild resistance" prior to the takedown and was subdued, especially when viewing the evidence in the light most favorable to him, Opening Br. 28. And even if Steinhoff was not "subdued," neither Kowalczyk nor Malovrh had any right to subdue Steinhoff at the moment of force. Opening Br. 21-23. They had no arrest warrant, nor had they found any new evidence that would have given them probable cause to arrest him. Opening Br. 21. And viewing the evidence in the light most favorable to Steinhoff, he was not fleeing or attempting to flee. Rather, he was complying with the officers' commands to turn around.

**B.    Malovrh does not meaningfully dispute that his rifle struck Steinhoff's ear during his takedown.**

Malovrh concedes that Steinhoff's "ear was cut … as he was taken down," Response Br. 36, but first tries to imply that *someone else's*—Ramberg's—gun struck Steinhoff in the ear. Malovrh says that he was not the only officer with a rifle that morning because "Captain Ramberg was also carrying an M16 rifle equipped with a sling." Response Br. 38. But Ramberg was dismissed from the case because all parties agree that he took no part in the takedown. R.38 at 5; R.46 at 1; App.8. Malovrh, on the other hand, *did* participate in the takedown, as Kowalczyk declared, R.40 ¶ 42, and Malovrh admits as much on appeal, Response Br. 47. Malovrh was the only one with a rifle in the scrum. No reasonable jury could conclude that Ramberg's rifle hit Steinhoff in the head.

**C.    This Court cannot separate the rifle strike, whether intentional or not, from its analysis of the force used to take Steinhoff to the ground.**

Malovrh accepts the possibility that his rifle struck Steinhoff's head but argues that the Court should disregard it because the strike was somehow simultaneously an "accident"—"Malovrh's rifle swung at his side from its sling" during the takedown—and also a "use of force" separate from the "takedown." Response Br. 37, 46-47. He is incorrect.

Steinhoff presented evidence that the strike was intentional. *Infra* Part III.D. And even if the strike were accidental, everyone agrees that it happened while Malovrh *intentionally* participated in the takedown of Steinhoff. *See* Response Br. 47; App.19 (Malovrh decided to "participate in subduing Steinhoff with an automatic rifle," presumably loaded, "slung loosely at his side."). So long as Malovrh used some force with intent to restrain Steinhoff, a seizure under the Fourth Amendment occurred, *Torres v. Madrid*, 592 U.S. 306, 317 (2021), and this Court must consider the "totality of the circumstances," *Barnes*, 605 U.S. at 76 (citation modified)—including all consequences of that force—in determining whether that force was excessive.[7] Thus, the question is whether it was objectively reasonable for Malovrh to "lung[e] toward" and tackle Steinhoff with a loaded automatic rifle "slung" so loosely "at his side," App.19, that it could "swing or fall" and hit Steinhoff in the head from just "a simple shift in position," Response Br. 44. The answer is "no."

Malovrh has no authority to the contrary. Malovrh relies on *Turner v. City of Champaign*, but *Turner* is readily distinguishable. 979 F.3d

---

[7] The parties agree that at least some of the force complained of as excessive must be used intentionally.

563, 567 (7th Cir. 2020). The two separate uses of force in *Turner* were: (1) "Officer Wilson's initial decision to grab Mr. Turner's shoulder" once Wilson caught up to him in an alleyway, and (2) once Turner "resist[ed]," Officer Wilson's and Officer Young's decisions to "pull [Turner] to the ground, pin down his shoulder and legs, and handcuff and hobble him." *Id.* at 568. Here, under Malovrh's theory, there was no separate "decision" to hit Steinhoff in the head with a rifle—the strike was an "accidental" part of his initial decision to tackle Steinhoff, Response Br. 44, not a reaction to resistance during an "ensu[ing]" "struggle," *cf. Turner*, 979 F.3d at 566.[8]

Malovrh also relies on *Brower v. County of Inyo*, 489 U.S. 593 (1989), but that case does not support his position either. *Brower*, like *Torres*, says that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower*, 489 U.S. at 596. "A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." *Id.* (citation modified). Here, Malovrh intended to acquire physical

---

[8] *Turner* might support a distinction between Malovrh's takedown and his use of force "once Steinhoff was on the ground," but Steinhoff does not challenge the latter on appeal. Opening Br. 10 n.3.

control of Steinhoff when Malovrh's gun hit Steinhoff. *See id.* Thus, Malovrh's actions implicate the Fourth Amendment.

Malovrh cites *Miller* and *Kemp v. Fulton County*, 27 F.4th 491 (7th Cir. 2022), for the proposition that Malovrh did not violate Steinhoff's rights unless Malovrh intended to hit Steinhoff in the head with his rifle. But those cases do not help him. The parties in *Miller* disputed "whether Gonzalez's use of force was accidental"; specifically, whether Gonzalez "stumbled and fell" onto plaintiff while "pursui[ng]" him or whether he "deliberately dropped his knee with his body's full weight onto Miller's jaw." 761 F.3d at 827-28. Here, Malovrh did not stumble and fall onto Steinhoff. Malovrh "deliberately" lunged at and took down Steinhoff.

*Kemp* is not a Fourth Amendment case, and Steinhoff meets *Kemp*'s threshold for excessive force in any event. *See* Opening Br. 35-36. *Kemp* held that "negligent conduct does not offend the Due Process Clause." *Kemp*, 27 F.4th at 496 (citation modified). Specifically, if "an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim." *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015). "But if the use of force is deliberate"—i.e., purposeful, knowing,

or perhaps even reckless—"the pretrial detainee's claim may proceed[.]" *Id.* Here, Steinhoff's claim should proceed even under *Kemp* because Malovrh intended to use force to restrain Steinhoff when he tackled him.

### D. Steinhoff presented evidence that Malovrh's rifle strike was intentional.

Even if this Court were to consider the rifle strike separately from Malovrh's decision to tackle Steinhoff, the district court's grant of summary judgment should be reversed. The district court granted summary judgment because it concluded that Steinhoff failed to provide evidence that Malovrh struck him in the head with the rifle "intent[ionally] or reckless[ly]." App.19-20. That was error.

Steinhoff presented enough evidence for a reasonable jury to find that Malovrh's rifle strike was intentional. In fact, Steinhoff provided more evidence than this Court concluded was sufficient for a reasonable jury to find intent in *Miller v. Gonzalez*. Opening Br. 37-42. As in *Miller*, Steinhoff provided (1) an officer's tacit admission that the force was intentionally used to punish the suspect for purportedly attempting to run and (2) discrepancies between the offending officer's police report and subsequent testimony. Opening Br. 38-40. Specifically, after Malovrh hit Steinhoff with the barrel of his rifle, Steinhoff complained that "my ear's

split with that gun you hit me with," and instead of disclaiming doing any such thing, an officer responded, "[w]ell, don't take off—try to take off when we're giving you orders." Video 8:41-51.

In addition to that evidence, Steinhoff testified that he saw the barrel of the rifle hit him while he was still standing, Response Br. 32; and there is a distinct "clink" on the video after Kowalczyk and Malovrh make contact with Steinhoff but before they drive him to the ground. Steinhoff argued that if the rifle hit him in the head while he was standing, an "accidental" strike becomes less likely. Opening Br. 37, 40-42.

Malovrh argues that the rifle "could … have accidentally struck Steinhoff while he was standing, being taken to the ground, or already on the ground." Response Br. 44. But Steinhoff pointed out that—if the rifle strike happened while he was standing, as the "clink" and his testimony indicate that it did—it is improbable that the barrel of an automatic rifle "slung" over Malovrh's left shoulder would go *up* to Steinhoff's head as Malovrh moved to take Steinhoff *down*. And even if this Court thought that the rifle strike might have happened while Steinhoff was being taken to the ground or that the barrel could have swung up, deciding between possible explanations is the prerogative of "a fact-finding

jury," *Miller*, 761 F.3d at 828, not a court. Steinhoff's evidence is more than enough for a reasonable jury to find that Malovrh intentionally or recklessly struck Steinhoff with his rifle. *Id.* at 827-28.

Malovrh's attempt to distinguish *Miller* fails. Response Br. 38-44. Malovrh accuses Steinhoff of "attributing the statement" about "try[ing] to take off" to him, Response Br. 38-39, but Steinhoff did no such thing. Steinhoff was careful to say only that "an officer" made the statement. Opening Br. 9, 39. And even if Malovrh did not make the statement, it is not "inherently implausible" that a jury could interpret the statement of an officer who witnessed the takedown with his own eyes as "implying that" Malovrh struck Steinhoff with his rifle as "retaliat[ion]" for his supposed attempt or preparation "to run." *See Miller*, 761 F.3d at 828.

Next, Malovrh claims that the discrepancies between his initial report and the video are "essentially one of phrasing" and "immaterial." Response Br. 41-42. Steinhoff acknowledged that the discrepancies *could be* an innocent mistake. Opening Br. 40. But the discrepancies, especially viewed in the light most favorable to Steinhoff, call Malovrh's credibility into question. *See Miller*, 761 F.3d at 828. Malovrh made several statements in his police report that were patently inconsistent with video—he

stated both that Steinhoff moved his hands toward his jacket (a movement that could be interpreted as reaching for a weapon) and that Steinhoff attempted to flee. App.64. If either statement had been true, the officers may have been justified in taking Steinhoff down. In other words, they are the kind of false statement an officer might make to "manipulat[e] facts to [justify] his intentional use of force." *See Miller*, 761 F.3d at 828.

Malovrh argues that these discrepancies aren't enough to overcome summary judgment, citing *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Response Br. 42. But *Springer* does not help him. There, the party opposing summary judgment had only "a collective hunch about the defendant's motives," pure "speculati[on]." *Springer*, 518 F.3d at 484. Here, in contrast, Steinhoff has "documents" and "statements," *cf. id.*, that a reasonable jury could use to call Malovrh's credibility into question.

In addition, the jury's interpretation would be bolstered by (1) the fact that Malovrh wrote his initial report before he knew that there was bodycam footage of the takedown, App.33, and (2) other inconsistencies between Malovrh's testimony and the other officers'. For example,

Malovrh categorically denied that he participated in the takedown at all, App.43 at 20:11-16, but Kowalczyk declared that Malovrh joined in the takedown while Steinhoff was still standing, R.40 ¶ 42. The point is that a reasonable jury could conclude that Malovrh was not credible, and such credibility determinations are "for a fact-finding jury." *See Miller*, 761 F.3d at 828.

In sum, there is enough evidence for a reasonable jury to find that Malovrh intentionally struck Steinhoff with a rifle. *See id.* So even if this Court limits Steinhoff's excessive force claim against Malovrh to the rifle strike, the district court erred by failing to let the jury decide whether Malovrh acted intentionally. But even if the strike were accidental, there is no basis to exclude the rifle strike from the analysis of Malovrh's efforts to take Steinhoff down, which violated the Fourth Amendment. Opening Br. 32-34. The district court's grant of summary judgment must be reversed.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment to Kowalczyk. The Court should also grant Steinhoff summary judgment on his excessive force claim against Kowalczyk. At the very

least, the issue of Kowalczyk's liability should be remanded for a jury trial.

This Court should also reverse the grant of summary judgment to Malovrh and should remand Steinhoff's claim against him for a jury trial.

Dated: November 17, 2025

/s/ Karl J. Worsham

Karl J. Worsham
PERKINS COIE LLP
2525 E. Camelback Rd., Ste. 500
Phoenix, Arizona 85016
Phone: (602) 351-8000
kworsham@perkinscoie.com

Sopen B. Shah
 *Counsel of Record*
PERKINS COIE LLP
33 E. Main St., Ste. 201
Madison, Wisconsin 53703
Phone: (608) 663-7460
sshah@perkinscoie.com

*Attorneys for Plaintiff-Appellant
Ryan Steinhoff*

# CERTIFICATE OF COMPLIANCE

The undersigned counsel for Plaintiff-Appellant Ryan Steinhoff hereby certifies the following:

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Seventh Circuit Rule 32(c) because this document contains 6,925 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionately spaced typeface using Microsoft® Word 365 in 14-point Century Schoolbook font.

Dated: November 17, 2025

/s/ *Karl J. Worsham*
Karl J. Worsham
PERKINS COIE LLP
2525 E. Camelback Rd., Ste. 500
Phoenix, Arizona 85016
Phone: (602) 351-8000
kworsham@perkinscoie.com

*Attorney for Plaintiff-Appellant*
*Ryan Steinhoff*

# CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff-Appellant Ryan Steinhoff hereby certifies that on November 17, 2025, undersigned counsel caused the foregoing to be filed electronically with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered users.

Undersigned counsel further certifies that all participants in the case are represented by counsel who are registered CM/ECF users.

/s/ Karl J. Worsham
Karl J. Worsham
PERKINS COIE LLP
2525 E. Camelback Rd., Ste. 500
Phoenix, Arizona 85016
Phone: (602) 351-8000
kworsham@perkinscoie.com

*Attorney for Plaintiff-Appellant Ryan Steinhoff*